# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| TERAN, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 13 C 6509 |
| | ) | |
| v. | ) | |
| | ) | Judge Amy J. St. Eve |
| VILLAGE OF WHEELING, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

Plaintiffs filed the present lawsuit against the Village of Wheeling, Illinois ("Wheeling")

for violating: Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601-3619, commonly

known as the Fair Housing Act ("FHA"); 42 U.S.C § 1983; 42 U.S.C. §1982, commonly known

as the Civil Rights Act of 1866; and Title VI of the Civil Rights Act of 1966, 42 U.S.C. § 601.

Defendant moves to dismiss Plaintiffs' First Amended Complaint or stay the case pursuant to

*Younger v. Harris*, 401 U.S. 37, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971) and *Colorado River*

*Water Conservation Dist. v. United States*, 424 U.S. 800, 96 S. Ct. 1236, 47 L. Ed. 2d 483

(1976).  For the following reasons, the Court grants in part and denies in part Defendant's

motion.

## BACKGROUND

In their First Amended Complaint ("FAC"), Plaintiffs allege that Wheeling and its agents

are seeking to force them from their mobile homes by enforcing its property maintenance code in

a discriminatory manner.  The Court accepts the following allegations as true for the purposes of

this motion.  Plaintiffs  (collectively, the "Homeowners") own mobile homes in the Fox Point Mobile Home Park located in the Village of Wheeling along the banks of the Des Plaines River. The Homeowners of Fox Point own their mobile homes and pay rent for the lot on which the mobile homes are located.  All but five, or approximately 88 %, of Fox Point households include people of Hispanic national origin, color, and race.  Fox Point is located on the banks of the Des Plaines River in a federally regulated flood-way.  Wheeling is a municipal corporation located in Cook County, Illinois, and is governed by Dean Argiris, the Village President.  Authority for the daily operation of Wheeling's government is delegated to Village Manager Jon A. Sfondilis, and Mark Janeck serves as its Director of Community Development.  Homeowners allege that Wheeling's population is 24.2 % Hispanic and 56.7 % White.[1]

The Homeowners experienced flooding of their homes on April 17-18, 2013 due to heavy rains and flooding of the Des Plaines River.  In most cases, flood water did not rise above the mobile home's skirting, which is a decorative cover for the open space between the ground and the bottom of the mobile home.  Wheeling, nevertheless, effectively condemned the mobile homes by citing the owners with multiple code violations.  Plaintiffs contend that many of these alleged violations are "baseless" and that when the Homeowners tried to remediate the alleged violations, Wheeling denied them building permits and failed to provide necessary information, such as the nature of the alleged violation.

## I.     Comprehensive Plan and Property Maintenance Code

Wheeling created a "Comprehensive Plan," which was approved in 2003 and updated in 2004, 2010, and 2013.  The Comprehensive Plan serves as "a guide for the elected and appointed officials of the Village of Wheeling as they initiate new development activities or review

---

[1] The 2010 U.S. Census Report for the Village of Wheeling reports that its Hispanic population is 31.2% and that the White population is 52.3%.  (http://quickfacts.census.gov/qfd/states/17/1781087.html (last visited June 16, 2014).)

proposals before them." A section of the Comprehensive Plan addressing "Residential Neighborhoods" states "[s]ince Wheeling has relatively little single-family housing for upper income buyers, what land is available for new housing should be reserved for this market."

The Comprehensive Plan singles out Fox Point as a problem area. It includes a map of the area where Fox Point is located with a caption stating, "existing used car lot, trailer part and other uses should be replaced by Park District open space. Floodplain conditions limit development opportunities in this area." The Comprehensive Plan also states:

> The portion of the Milwaukee Avenue corridor between Manchester Avenue and Palwaukee Municipal Airport at the south end of the Village is one of Wheeling's biggest challenges in terms of future land use. The current land use mix includes single-family houses, a mobile home park, old and new multi-family developments, and a variety of commercial, industrial and airport uses. The Village's corporate boundaries are irregular along this portion of the corridor, which limits Wheeling's ability to control the future development and ensure that the existing developments are properly maintained. The Future Land Use Plan calls for a more consistent land use pattern with commercial uses along the west side of Milwaukee Avenue, except for property along Industrial Drive, where industrial and airport related uses are recommended.

The Homeowners contend that the map and text, when read together, call for the elimination of the mobile park home. They also allege that the Comprehensive Plan does not provide sufficient replacement housing within the redevelopment areas to allow the displaced Hispanic and Latino residents to remain in Wheeling.

The Homeowners allege that since 2011, Village President Argiris has contemplated removal of Fox Point, and they cite to Meeting Minutes from a Village Board of Trustees meeting on May 9, 2011. Those minutes indicate that Argiris suggested researching public housing options so the Fox Point residents could be relocated to where it is safer and healthier for them.

In 2012, Wheeling adopted the International Building Code, which included a provision that "if a building or other structure is damaged or destroyed by any means to the extent of 50

percent (50%) or more of its replacement value at that time, the building or other structure can be rebuilt thereafter only for a conforming use and in compliance with the provisions of this code." The Homeowners contend that this provision unfairly targets them because a mobile home reaches the 50 percent damage limitation more easily than a conventional home because it is worth less and the relatively minor repair costs will preclude the homeowner from making the repairs. The Homeowners also allege that this Code is "selectively enforced against Hispanic and Latino homeowners based on their color, race, and national origin, to eliminate their mobile-home community."

## II.     Selective Enforcement

The Homeowners allege that the revised property maintenance code is selectively enforced against Homeowners. In support, they assert that a predominantly white community along the Des Plaines River was also flooded in April 2013 and at other times, and that rather than issue citations and violations, Wheeling provided pumps and worked to mitigate the losses of this predominantly white community.

The Homeowners allege that after the April 2013 flooding, they have tried to (1) assess the extent of the damage to their homes, (2) discover the reasons Wheeling issued code violations so they could make repairs, and (3) obtain building permits. When they have tried to communicate with Wheeling about these issues, Wheeling has refused to provide any materials in Spanish and has refused to provide clarification in Spanish or English about the nature of the property violations mentioned in various Notices of Violation sent to the homeowners.[2]

---

[2] Plaintiffs acknowledge that at their request, Wheeling "agreed to provide interpreters for the enforcement proceeding as part of the settlement of Homeowners' Motion for Preliminary Injunction." (R. 40, Resp. at 17.)

### III. Notices of Violation

Wheeling issued these Notices of Violation in English and the Homeowners allege that they did not specify the nature of the alleged code violation. Wheeling issued the Notices on May 15 and May 23, 2013. The May 15 Notices informed the recipients that the premises have "been determined as UNINHABITABLE, due to present non-compliance with" a number of International Property Maintenance Code ("IPMC") sections. The Notice then went on to describe the violations:[3]

> Electrical Service disconnect panels providing service from transformers contain substantial rust and signs of deterioration on interior panel conduit connections and electrical elements. Direct service connection plug conduits from mobile homes to disconnect panels are missing plug mechanisms, have been manually altered to provide a "hard wire" connection to disconnect panels, and show indications of rust and corrosion. Interior electrical outlets appear compromised by dirt in many cases, outlets were observed within 6" of the floor elevation.

> Flooring has been negatively affected by water, visual existence of subfloor deterioration and decay in numerous locations in the mobile home. Floor is deteriorated to the point that it is unable to safely support daily homeowner use. Floor covering throughout unit has become disengaged from the wooden subfloor. Carpeting in many cases covers deteriorating subfloor.

> Exterior structural supports for home not connected to structure, mobile home exterior tie-downs either loose or not in existence, structural supports sinking into the ground. Existing earth underneath the mobile home does not have the proper bearing capacity required to safely support this type of structure. Soil bearing capacity located beneath support elements for the mobile home have been further compromised due to floodwaters. Structural support elements are sinking into the soil and allowing the structure to settle and shift from its intended location. Shifting and sinking of the home has been visually recorded. Shifting and sinking of the home compromises the safety of gas and electrical piping and wiring that accesses the home.

---

[3] Defendant attaches the Notices to its Motion to Dismiss (R. 31.) The Court may consider them without converting the motion to dismiss into a motion for summary judgment because Plaintiffs refer to them repeatedly throughout their FAC and they are a central part of Plaintiffs' claims. *Geinosky*, 675 F.3d at 745 n. 1 (stating that a 12(b)(6) motion can be based on "documents that are critical to the complaint and referred to in it").

Waste water connection from trailer unit to site sewer not properly connected. Noncompliant materials (rubber hoses/plastic tubing) used throughout inside and out for domestic potable water connections.

Forced air duct work and structural support joists appear to be compromised by floodwaters. Ducts and air outlets contain substantial amounts of dirt and the extensive appearance of mold. Water was visually observed standing in the ductwork. Mechanical elements within the structure reflect numerous life/safety violations of the municipal code.

Sanitation conditions in the unit do not meet the standards of the municipal code relative to the safety and welfare of the residents.

Additional sections of Village Code germane to code violations within this unit include the following:

IPMC 304.1.1 Unsafe Conditions, IPMC 504.3 Plumbing systems hazards, NEC 110.12 Mechanical Execution of Work, IPMC 200.3 Connection to Grounded System, IPMC 305.2 Structural members, IPMC 604.3 Electrical systems hazards, IPMC 604.1 Abatement of electrical hazards associated with water exposure, IPMC 702.1 General, IPMC 1027.5 Access to a public way.

### *Remedial Action*

Vacate structure within fourteen (14) days of this Notice.

Please be aware that due to the existing poor condition and age of this structure and the need for all repairs to comply with all municipal building, property maintenance, floodplain, and life safety codes and regulations as well as federal floodplain regulations, the ability to remediate the deficiencies identified in this Notice and comply with the applicable codes is unlikely. Further, the ability to obtain municipal permits will be difficult. Depending on the repairs and permits requested, observance of municipal codes or re-certification by the manufacturer of the home could be required.

If you intend to attempt to repair or mitigate dangerous conditions that exist in the structure, plans will be required to be submitted to the Village of Wheeling Community Development Department by an architect or structural engineer detailing repairs that comply with municipal building, property maintenance, floodplain, and life safety codes and regulations. You are encouraged to contact the Community Development Department to discuss your plans before incurring any expense related to remediation actions that may not be allowed.

An inspection will be conducted on or about **Wednesday, May 29, 2012** [sic], to determine compliance with this Notice. Failure to comply may result in the initiation of legal action by the Village of Wheeling. Contact the Village's Social Services Department at (847) 459-2606 for information on potential resources and programs available to you.

The May 23 Notices identified the property as "Non-Compliant" rather than "Uninhabitable" and included a similar but slightly less extensive "Description of Violation." They also included the following "Remedial Action":

> If you intend to attempt to repair or mitigate dangerous conditions that exist relative to this structure, plans will be required to be submitted to the Village of Wheeling Community Development Department by an architect, licensed electrician, or structural engineer detailing repairs that comply with municipal building, property maintenance, floodplain, and life safety codes and regulations. You are encouraged to contact the Community Development Department to discuss your plans before incurring any expense related to remediation actions that may not be allowed.

> Re-inspection will be conducted on or about **Monday, June 10, 2013**, to determine compliance with municipal codes. Failure to comply may result in the initiation of legal action by the Village of Wheeling. Contact the Village's Social Services Department at (847) 459-2606 for information on potential resources and programs available to you.

> Please be aware that due to the existing poor condition and age of this structure and the need for all repairs to comply with all municipal building, property maintenance, floodplain, and life safety codes and regulations as well as federal floodplain regulations, the ability to remediate the deficiencies identified in this Notice and comply with the applicable codes is unlikely. Further, the ability to obtain municipal permits will be difficult. Depending on the repairs and permits requested, observance of municipal codes, or re-certification by the manufacturer of the home could be required.

## IV.    Harrassment

Homeowners allege that they have been constantly harassed by Wheeling's agents, including but not limited to Mark Janeck. This harassment has been in the form of repeated property inspections, inconsistent property inspections, English-only Notices of Violation that do not specify the nature of the code violation, and his refusal to discuss specific code violations with the Homeowners so they can begin repairs. Mark Janeck and other Wheeling officials told Homeowners that they should prepare to leave Fox Point. Mark Janeck also told Terry Nelson, President of the Mobile Home Owners Association of Illinois (MOHAI), "how can those people

raise a family in there?!"  The Homeowners allege that the phrase "those people" was a reference to the Homeowners' Hispanic ethnicity.

The Homeowners filed their initial Complaint on September 11, 2013.  On October 10-11, 2013, this Court held a preliminary injunction hearing on Plaintiffs' motion to enjoin Wheeling from further prosecuting ordinance violations or administrative remedies against them. At the close of that hearing, Plaintiffs withdrew their motion in light of an agreement they reached with Wheeling.  On approximately October 16, 2013, Wheeling left on several mobile homes a notice from its Building Department declaring: "KEEP OUT.  Uninhabitable.  Contact Village of Wheeling before entering."

## LEGAL STANDARD

"A motion under Rule 12(b)(6) tests whether the complaint states a claim on which relief may be granted."  *Richards v. Mitcheff,* 696 F.3d 635, 637 (7th Cir. 2012).  Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The short and plain statement under Rule 8(a)(2) must "give the defendant fair notice of what the claim is and the grounds upon which it rests."  *Bell Atlantic v. Twombly,* 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (citation omitted).  Under the federal notice pleading standards, a plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level."  *Id.*  A complaint must contain sufficient factual content "to allow the court 'to draw a reasonable inference that the defendant is liable for the misconduct alleged.'"  *Charleston v. Board of Trs. of Univ. of Ill. at Chicago*, 741 F.3d 769, 772 (7th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)).  Put differently, a complaint "must provide enough details about the subject matter of the case to present a story that holds together."  *Mehta v. Beaconridge*

*Improvement Ass'n*, 432 Fed. Appx. 614, 616 (7th Cir. 2011) (citing *Erickson v. Pardus*, 551 U.S. 89, 93, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007); *Swanson v. Citibank*, 614 F.3d 400, 404 (7th Cir. 2010)). The Court asks "whether the story could have happened, not whether it did." *Id.*

"In reviewing the sufficiency of a complaint under the plausibility standard, [courts] accept the well-pleaded facts in the complaint as true." *Alam v. Miller Brewing Co.*, 709 F.3d 662, 665-66 (7th Cir. 2013). In ruling on a Rule 12(b)(6) motion, district courts may also consider documents attached to the pleadings without converting the motion into a motion for summary judgment, as long as the documents are referred to in the complaint and central to the claims. *See Geinosky v. City of Chicago*, 675 F.3d 743, 745 n. 1 (7th Cir. 2012). Additionally, although a plaintiff need not plead facts in the complaint to defeat potential affirmative defenses, where "the allegations of the complaint itself set forth everything necessary to satisfy [an] affirmative defense," the plaintiff pleads himself out of court. *See Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir. 2009).

## ANALYSIS

Wheeling moves to dismiss each of the Homeowners' eight counts and, in the alternative, moves to stay this lawsuit pursuant to *Younger* and *Colorado River*. The Court will first address Wheeling's abstention argument.

## I.      Abstention

Wheeling contends that the Court should stay this lawsuit to allow Wheeling's administrative adjudication of the citations it has issued to the Homeowners to continue. Wheeling asserts in its reply that it "has administratively adjudicated all of Plaintiffs' citations for violations of the Village's unsafe and dangerous structures ordinances," and that each

Homeowner was found to be liable for maintaining a structure with unsafe conditions. (R. 41, Reply at 14.) Wheeling further contends that twenty-two of the thirty-four findings of liability have come due for appeal to the Circuit Court of Cook County under the Illinois Administrative Review Act, 735 ILCS 5/3-101, *et seq*., and that fifteen of the twenty-two findings that the Homeowner could have appealed have been appealed. Of those fifteen, the circuit court has set briefing schedules or oral argument dates in nine. (*Id*.)

Wheeling asserts that under *Younger*, it has "a paramount interest in preserving the public's health, safety, and welfare, and Plaintiffs seek federal court intervention under the FHA to prohibit [Wheeling] from prosecuting legitimate serious health and safety violations of [Wheeling's] Municipal Code in Plaintiffs' mobile homes." (R. 31, Mot. at 14.) Wheeling further contends that Plaintiffs have raised allegations of discrimination in the administrative adjudication setting and may continue to present those arguments on appeal in the Illinois state courts. (*Id*.)

The Supreme Court recently clarified the *Younger* doctrine stating, "*Younger* exemplifies one class of cases in which federal-court abstention is required: when there is a parallel, pending state criminal proceeding, federal courts must refrain from enjoining the state prosecution. This Court has extended *Younger* abstention to particular state civil proceedings that are akin to criminal prosecutions, or that implicate a State's interest in enforcing the orders and judgment of its courts." *Sprint Communications, Inc. Jacobs*, -- U.S. --, 134 S. Ct. 584, 588 187 L. Ed. 2d 505 (2013) (internal citations omitted). The Supreme Court found that "circumstances fitting within the *Younger* doctrine … are 'exceptional,'" and limited *Younger* to apply to state criminal prosecutions, civil enforcement proceedings, and civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions. *Id.* at

588. Further, "even in the presence of parallel state proceedings, abstention from the exercise of federal jurisdiction is the 'exception, not the rule.'" *Id*. at 593; *Colorado River* 424 U.S. 800.

While Wheeling acknowledges the Supreme Court's clarification in *Sprint* that the *Younger* doctrine is limited to three categories of proceedings, it fails to explain how this case applies as one of those exceptions. Instead, it only vaguely refers to "the constellation of State court litigation between the parties, and the importance of the outcomes of those proceedings on any surviving claims before the Court." (Reply at 15.) Whatever this undeveloped argument means, it does not amount to one of the limited circumstances in which the Court should abstain pursuant to the *Younger* doctrine. This case does not involve state criminal prosecutions, civil enforcement proceedings, or an issue that is "uniquely in furtherance of the state courts' ability to perform their judicial functions." Absent these "exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest" the Court finds no compelling reason to abdicate its obligation to decide this case. *Colorado River*, 424 U.S. at 813.

## II.     Counts I – IV: Fair Housing Act Claims

Counts I, II, III, and IV of the FAC allege violations of the Fair Housing Act. Wheeling moves to dismiss each count for failure to state a plausible violation of the FHA. The Court will address each Count in turn.

### A.     Count I

The Homeowners plead that Wheeling's enforcement of its Building Code violates Sections 804(a) and (b) of the FHA because it "has made housing unavailable because of national origin, race, or color and also constitutes discrimination in terms, conditions, or privileges of sale or rental of dwellings or in the provision of services because of national origin,

race or color." (FAC, ¶ 24.) The Homeowners assert that Wheeling's "adoption and implementation of the Comprehensive Plan has made and will make housing unavailable because of national origin, race, or color in violation of Section 804(a) of the FHA." (*Id.*, ¶ 25.) They also generally allege that the "conduct of Defendant, through its officials, described above, constitutes a violation of the [FHA]." (*Id.* ¶ 26.) This conduct, the Court presumes, includes the alleged selective enforcement of the property maintenance code, the alleged refusal to discuss specific code violations with the Homeowners, and Mark Janeck's alleged comments to the Homeowners and Terry Nelson.

The purpose of the Fair Housing Act is to ensure fair and equal housing opportunities throughout the United States. 42 U.S.C. § 3601. Section 804(a) of the FHA provides that it is unlawful "to make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). Section 804(b) makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b). The FHA governs discriminatory conduct regardless of whether it occurs before or after a tenant or owner has acquired a property interest in a dwelling. *Bloch v. Frischholz*, 587 F.3d 771, 776 (7th Cir. 2009) (en banc).

An FHA claim should contain factual allegations identifying (1) the type of discrimination that occurred (2); who discriminated against the plaintiffs; and (3) when the discrimination took place. *McCauley v. City of Chicago*, 671 F.3d 611, 617 (7th Cir. 2011); *Swanson v. Citibank, N.A.*, 614 F.3d 400, 405 (7th Cir. 2010). Plaintiff's FHA claim is straight-forward and it is well-established that the amount of factual allegations required to state a

plausible claim for relief under *Twombly* and *Iqbal* depends on the complexity of the case. *See Adams v. City of Indianapolis*, 742 F.3d 720 (7th Cir. 2014); *Limestone Dev. Corp. v. Village of Lemont, Ill.*, 520 F.3d 797, 803 (7th Cir. 2008).

The Homeowners' FAC identifies the type of discrimination (racial, ethnic, or national origin), by whom (Wheeling), and when (in April 2013 following the flooding of the Fox River). Count I also alleges that Wheeling made unavailable or denied Plaintiffs housing, in violation of § 3604(a) and discriminated against them in the provision of services, in violation of § 3604(b). These allegations state a claim. *See Swanson*, 614 F.3d at 405. The Court, therefore, denies Defendant's motion to dismiss Count I.

### B.  Counts II & III

In Counts II and III of the FAC, the Homeowners allege that after they asserted their rights under the FHA via an August 22, 2013 letter sent to Dean Argiris and their initial Complaint, Wheeling posted notices on the homes of certain residents stating, "KEEP OUT. Uninhabitable. Contact Village of Wheeling before entering." The Homeowners assert that Wheeling posted these notices on approximately October 16, 2013 without any hearing or due process of any kind. Count II seems to allege a general violation of the FHA because the Homeowners assert that Wheeling's conduct was directed at them because of their Hispanic and Latino ethnicity.

Count III alleges that this conduct violated 42 U.S.C. § 3617 because it constituted coercion, intimidation, threats, or interference with the Homeowners exercise of their rights under the FHA. The Homeowners contend that the housing conditions of the mobile homes did not change after Wheeling issued the Notices of Violation, and that Wheeling's sole purpose in posting the "KEEP OUT" notices was to intimidate them.

To prevail on a § 3217 retaliation claim, Plaintiffs must allege that (1) they are protected individuals under the FHA, (2) they were engaged in the exercise or enjoyment of their fair housing rights, (3) the Defendant coerced, threatened, intimidated, or interfered with the Plaintiffs on account of their protected activity under the FHA, and (4) the Defendant was motivated by an intent to discriminate. *Bloch*, 587 F.3d at 783. Defendant concedes that some of the Plaintiffs are protected individuals under the FHA, and the FAC alleges that Plaintiffs' exercising of their fair housing rights prompted Defendant to threaten, intimidate, or interfere with them in the form of the "KEEP OUT" notices. Plaintiffs also allege that Defendant intended to discriminate against Plaintiffs based on their race, ethnicity, and national origin. These allegations sufficiently state a claim under § 3217. The Court, therefore, denies Defendant's motion to dismiss Count III. Count II, on the other hand, is duplicative of Count III and it does not allege any specific violation of the FHA. The Court, therefore, dismisses Count II of the FAC.

## C.     Count IV

The Homeowners allege in Count IV that Wheeling's actions have had a "substantial adverse, disparate impact on Hispanic and Latino households in violation" of §§ 3604(a) and (b) of the FHA. Count IV further contends that Wheeling's actions violate the U.S. Department of Housing and Urban Development's ("HUD") prohibition on disparate impact on "enacting or implementing land-use rules, ordinances, policies, or procedures that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings to persons because of" race, color, or national origin. CFR § 100.70(d)(5).

The Seventh Circuit advises that plaintiffs can prove discrimination under § 3604 in two ways. The first is to prove discriminatory intent. The second is to prove a modified disparate

impact. *Bloch*, 587 F.3d at 784. Plaintiffs have already alleged discrimination under § 3604 in Count I. Their attempt to plead a separate cause of action based on the "disparate impact" of Wheeling's actions misses the mark. "Disparate impact" is a method of proof, not a separate cause of action. The Court, therefore, dismisses Count IV as duplicative of Count I.

### III.     Counts V and VII: 42 U.S.C. § 1983

In Count V, Plaintiffs allege a Fourteenth Amendment due process violation pursuant to 42 U.S.C. § 1983 based on Wheeling's posting of the "KEEP OUT" notices on certain of the Homeowners' mobile homes.[4] The Homeowners contend that these notices, which deemed the mobile homes to be "uninhabitable" and ordered the residents to "contact Village of Wheeling Building Department before entering," infringe upon and deprive the affected Homeowners of their property rights "without meaningful and adequate notice and opportunity to be heard." (FAC, ¶ 39.)

In Count VII, Plaintiffs allege a violation of the Equal Protection Clause of the Fourteenth Amendment based on Wheeling's intentional discrimination of the Homeowners because of their Hispanic and Latino ethnicity and national origin.

Wheeling challenges the Homeowners § 1983 claims based only on *Monell v. Dep't. of Social Services*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). Wheeling argues that it is not liable to the Homeowners under 42 U.S.C. § 1983 as a matter of law because the Homeowners allege that Wheeling is liable under a *respondeat superior* theory only. (Mot. at 8.) Wheeling asserts that the Homeowners "do not attempt to plead a cause of action against the Village pursuant to *Monell*, and cannot do so in this matter." (*Id.*)

"A government entity violates the Due Process Clause only if it maintains a policy or custom that infringes upon the rights protected by that clause." *Hamilton v. County of Madison,*

---

[4] The FAC does not identify which of the Homeowners received the Notices.

*Ill.*, 746 F.3d 766, 780 (7th Cir. 2014).  To establish liability against Wheeling, Plaintiffs "must show the existence of an 'official policy' or other governmental custom that not only causes but is the 'moving force' behind the deprivation of constitutional rights."  *Teesdale v. City of Chicago*, 690 F.3d 829, 833 (7th Cir. 2012).  Plaintiff can demonstrate this requirement through (1) an actual official policy; (2) a practice or custom that, although not officially authorized, is widespread and well-established; or (3) a deliberate act from a Wheeling employee with final policy-making authority.  *Gonzalez v. Village of West Milwaukee*, 671 F.3d 649, 664 (7th Cir. 2012).

When viewed in the light most favorable to Plaintiffs, the allegations in the FAC assert that Wheeling's Comprehensive Plan constituted a policy to intentionally force the Homeowners out of their mobile home community, that Wheeling has carried out this policy through its implementation and enforcement of its Property Maintenance Code, and that Wheeling has selectively applied the Plan and Code based on the Homeowners' ethnicity and national origin. Plaintiffs also allege that a predominantly white community along the Des Plaines River experienced similar flooding in April 2013 and that Wheeling[5] provided pumps and worked to mitigate their losses rather than issue citations for building code violations.  (FAC, ¶ 18.)  In addition, Plaintiffs' allegations indicate that the Comprehensive Plan was the moving force behind Defendant's alleged deprivation of their constitutional rights.  These allegations sufficiently state a claim of violation of 18 U.S.C. § 1983 under *Monell*.  436 U.S. at 690 ("[l]ocal governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted

---

[5] The Court presumes that the FAC alleges it was the Village of Wheeling that provided this help to the "white community along the Des Plaines River."  The FAC refers only to the "City," despite the fact that the FAC refers to Wheeling as the "Village" throughout.

and promulgated by that body's officers"); *see also Bd. of County Com'rs of Bryan County, Ok. v. Brown*, 520 U.S. 397, 403, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997) ("in Monell and subsequent cases, we have required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury"). The Court, therefore, denies Defendant's motion to dismiss Counts V and VII.

## IV. Count VI: Civil Rights Act of 1866

The Civil Rights Act of 1866, now 42 U.S.C. §1982, provides "[a]ll citizens of the United States shall have the same right in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." The Homeowners allege that Wheeling's conduct violated § 1982. Count VI alleges that Wheeling's attempt to "declare uninhabitable or demolish all the homes within Fox Point" through the maintenance and implementation of the Comprehensive Plan is an intentional attempt to deprive the plaintiffs and other Hispanic and Latino residents of the right to "inherit, purchase, lease, sell, hold, and convey real and personal property, as is enjoyed by white citizens." (FAC, ¶ 43.)

Defendant challenges Count VI in its motion to dismiss with the undeveloped argument that Plaintiffs "do not plausibly allege that the Village took any action that denies Plaintiffs the same right "as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." (Mot. at 9.) In its reply, Defendant contends that Plaintiffs "have not plausibly linked the Village's alleged actions to their national origin, except by repeating the legal conclusion that the Village 'intentionally discriminated' *ad nauseum*." (Reply at 10-11.) The Court disagrees. When viewed in the light most favorable to Plaintiffs, the FAC states a plausible claim that Wheeling denied Plaintiffs their right, as enjoyed by white citizens, to hold personal property, namely, their mobile homes. In addition to the allegations

regarding the Comprehensive Plan and the property maintenance code, the Homeowners allege that Wheeling provided remedial flood-related services to a white community that it denied to the Homeowners. These allegations sufficiently state a claim for relief based on 42 U.S.C. § 1982. The Court, therefore, denies Defendant's motion to dismiss Count VI.

## V.     Count VIII: Civil Rights Act of 1964

Finally, the Homeowners allege that Wheeling violated Section 601 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d, which provides that no person shall "on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." (FAC, ¶ 49.) Count VIII contends that Wheeling is a recipient of federal funds and that the Homeowners are limited English proficient individuals because they have limited English proficiency and they have encountered the court system. (Id., ¶¶ 49-50, 54.) Count VIII also alleges that Wheeling has denied the Homeowners the benefit of interpreters and translated documents in the administrative actions described in the FAC. (*Id.* ¶ 50.) Specifically, the Homeowners allege that most of the Homeowners have limited English proficiency and that Wheeling has not provided Spanish-translated documents in any of the administrative proceedings. (*Id.* ¶¶ 51, 54.) The Homeowners further assert that the administrative law process included Spanish interpreters only because of an agreement based on this lawsuit. (*Id.* ¶ 52.) On information and belief, the Homeowners allege that Wheeling lacks any plan to provide limited English proficiency services. (*Id.* ¶ 55.) The Homeowners assert that Title VI of the Civil Rights Act requires recipients of federal funds to provide interpreters and translated documents to people with limited English proficiency and that Wheeling's deprivation violates their civil rights under Title VI. Viewing the allegations in the light most favorable to the Plaintiffs, the

Homeowners assert that Wheeling's conduct violated § 601 because it excluded them from participating in, denied them the benefits of, and discriminated against them in the code enforcement proceedings and that Wheeling did so on the basis of the Homeowners' race, ethnicity, and national origin.

Defendant argues that *Alexander v. Sandoval*, 532 U.S. 275, 285-86, 121 S. Ct. 1511, 149 L. Ed. 2d 517 (2001) settled that "there is no private cause of action under the federal law relied upon by Plaintiffs." (Mot. at 9.) Defendant relies on the holding of *Alexander*, which states "[n]either as originally enacted nor as later amended does Title VI display an intent to create a freestanding private right of action to enforce regulations promulgated under § 602. We therefore hold that no such right of action exists." 532 U.S. at 293. The FAC, however, asserts a violation only of § 601 of Title VI. § 602 addresses the authority of federal departments and agencies to issue rules, regulations, or orders of general applicability to effectuate the provisions of § 601. 18 U.S.C. § 2000d-1. § 602 allows the federal departments and agencies to ensure compliance through "the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record … of a failure to comply with such requirement." *Id.* *Alexander* clearly states that "private individuals may sue to enforce § 601 of Title VI and obtain both injunctive relief and damages." *Id*. at 279. *Alexander* also clarifies that § 601 "prohibits only intentional discrimination." *Id*. at 280.

Plaintiffs argue that they have alleged that Wheeling purposefully limited the code enforcement proceedings to English and that Wheeling intentionally discriminated when it "either design[ed] or maintain[ed] a process where government may impinge on one's liberty or property and do so only in a language that is incomprehensible to the individual subject to the

motion." (R. 40, Resp. at 17.) Plaintiffs concede, however, that at their request, Wheeling "agreed to provide interpreters for the enforcement proceeding as part of the settlement of Homeowners' Motion for Preliminary Injunction." (*Id*.) Further, despite the arguments in their response, Plaintiffs also do not allege any facts that Wheeling *intentionally* conducted the proceedings in a language the Homeowners could not understand.

Plaintiffs also fail to identify the specific program or department that received federal funding and instead allege only that "the Village of Wheeling is a recipient of federal funds." (FAC, ¶ 50.) In bringing a Title VI discrimination claim, Plaintiffs must identify the specific program or activity that receives federal funds and thus is subject to §§ 601 and 602. *See David K. v. Lane*, 839 F.2d 1265, 1275 (7th Cir. 1988) (stating that "only a program which actually benefited from the receipt of federal funds administered under Title IX was subject to the Title IX regulations prohibiting discrimination" and noting that Title IX was based on Title VI).

Homeowners, therefore, fail to state a claim for relief under Title VI of the Civil Rights Act of 1964, and the Court grants Defendant's motion to dismiss Count VIII.

## VI. Punitive Damages

Wheeling argues that the Court must strike Plaintiffs' request for punitive damages. (Mot. at 11.) Wheeling is correct that it is immune from liability for punitive damages under 42 U.S.C. §1983 and 42 U.S.C. § 1982. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271, 101 S. Ct. 2748 (1981) ("we hold that a municipality is immune from punitive damages under 42 U.S.C. §1983"); *Minix v. Canarecci,* 597 F.3d 824, 830 (7th Cir. 2010) ("municipalities are immune from punitive damages in § 1983 suits"); *Bell v. City of Milwaukee*, 746 F.2d 1205, 1270-71 (7th Cir. 1984) (*overruled on other grounds*) (extending municipal immunity to § 1985 suits and stating "[i]rrespective of the Section of the civil rights statute that plaintiffs invoke …

the well-established policy of municipal immunity from punitive damages cannot be ignored")
*Wade v. Cicero, Illinois*, 571 F. Supp. 157, 159 n. 4 (N.D. Ill. 1983) ("although we have
discussed only cases dealing with 42 U.S.C. § 1983, the same rationale would apply with regard
to 42 U.S.C. § 1982").

Wheeling also asserts that Homeowners have not pled facts sufficient to support an award
of punitive damages under the FHA.  (Mot. at 11.)   In support, Wheeling relies on *Hispanics
United of DuPage County v. Village of Addison, Ill.*, 958 F. Supp. 1320, 1331 (N.D. Ill. 1997),
which, it contends, requires "allegations of widespread and knowledgeable participation by
taxpayers in the municipality's outrageous abuse of constitutional rights."  (Mot. at 11.)
Plaintiffs also cite *Hispanics United* in support of their claim for punitive damages.  The relevant
discussion in *Hispanics United* arose in a similar context to the one present here.  The court
noted the municipal immunity that applies to civil rights cases, but acknowledged "a narrow
exception" that *Fact Concerts* considered in a footnote.  958 F. Supp. 1331-32.  That footnote,
footnote 29, stated, "[i]t is perhaps possible to imagine an extreme situation where the taxpayers
are directly responsible for perpetrating an outrageous abuse of constitutional rights . . . such an
occurrence is sufficiently unlikely that we need not anticipate it here."  *Fact Concerts*, 453 U.S.
at 267 fn. 29.  The court in *Hispanics United* considered the plaintiffs' argument that such a
situation is less unlikely in FHA violations because "land use decisions are often the result of the
discriminatory wishes of constituents."  958 F. Supp. 1332.  The court noted that no plaintiff has
successfully invoked footnote 29 under the FHA or any other civil rights statute, but also
indicated that the determining factor in deciding whether to apply that exception was "the extent
and nature of taxpayer participation in reprehensible municipal conduct."  *Id.*  The court stated
that it lacked sufficient information to make this determination but "decline[d] to foreclose the

possibility of awarding punitive damages should the plaintiffs meet their stiff burden of proving the residents' widespread knowledge and participation in perpetrating an outrageous abuse of constitutional rights." *Id.*

Here, the Homeowners have not pled any facts that Wheeling's taxpayers "are directly responsible for perpetrating an outrageous abuse of constitutional rights." Indeed, any punitive damages the Court applied against the Village of Wheeling for alleged civil rights violations based on Plaintiffs' Hispanic and Latino ethnicity and national origin would fall on the shoulders of its residents. This would be a particularly perverse outcome given that 31% of Wheeling's population identified itself as Hispanic as of the 2010 Census. The Court grants Defendant's motion to strike Plaintiffs' request for punitive damages.

## CONCLUSION

For these reasons, the Court grants Defendant's Motion to Dismiss Counts II, IV, and VIII and denies Defendant's Motion to Dismiss Counts I, III, V, VI, and VII. The Court also denies Defendant's motion to stay the case pursuant to the *Younger* doctrine and grants Defendant's Motion to strike Plaintiff's request for punitive damages.


Dated:  June 30, 2014                                    ENTERED:

                                                         AMY J. ST. EVE
                                                         United States District Court Judge