**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Ranulfo Teran, Elena Corona, Juan G. Lara, Maria I. Lara, | ) | |
| Arturo Lara, Crystal Antunez, Saul Cruz, Emma Cisneros, | ) | |
| Cesar Herrera, Daisi Cisneros, Angel Herrera, Ken Nash, | ) | |
| Linda Abrahamson, Aned Hernandez, Lynn Jones, Herbert Wolff, | ) | |
| Esteban Barrera, Jr.., Reyna Velazquez, Nahucelio Guadalupe, | ) | |
| Inocencia Guadalupe, Jean Piatrowski, Roberto Flores, Sylvia | ) | No.:  13 cv 06509 |
| Bahena Navarro, Wendy Lara, Denise Lara, Javier Sanchez, | ) | |
| Juan Carlos Rodriguez, Lucy Bravo, Leonardo Bravo, Elias | ) | |
| Carreno, Maria Carreno, Esteban Barrera, Sr., Mercedes Barrera, | ) | |
| Jose A. Guillen, Ernesto Garcia, Leonardo Chan, Claudia Chan, | ) | The Honorable Amy J. |
| Osvaldo Chavez, Sherry Lengieza, Evangelina Ortiz, Felipe Ortiz, | ) | St. Eve |
| Pablo Moncada,, Felipe L. Moncada, Elina Martinez, | ) | |
| Fernando J. Manrique, Linda Lara, Eloy Hernandez, Marciela | ) | |
| Hernandez, Javier Barrera, Mai Dolores Barrera, and Alejandra | ) | |
| Barrera, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **Jury Trial Demanded** |
| v. | ) | |
| | ) | |
| Village of Wheeling, | ) | |
| | ) | |
| Defendants. | ) | |

**SECOND AMENDED COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF**

NOW COME Plaintiffs named in Exhibit A, (Homeowners), by and through their

attorney, Kelli Dudley of the Law Office of Kelli Dudley, and, based on personal knowledge,

allege as follows as for their Complaint against the Village of Wheeling, Illinois:

**INTRODUCTION**

1.     Defendant Village of Wheeling, Illinois (Defendant or Village) and its agents are

seeking to force Homeowners from their homes, approximately forty mobile homes along the

Des Plaines River, by enforcing the Defendant's property maintenance code in a discriminatory

manner. Homeowners own their manufactured homes, also known as "mobile homes," and pay

1

rent for the lot on which the mobile homes are placed. The manufactured housing community, or mobile home park, where the homes are placed is Fox Point and is owned by Alpine Village Partners.

2.      Homeowners experienced flooding of the area near their homes due to a flood of the Des Plaines river. In most cases, the water did not rise above the skirting of the mobile home. Skirting is a decorative form of shingles or siding applied to the exterior of a mobile home to cover the open space between the ground and the bottom of the manufactured home. If water is below the top of the skirting, it has not reached the actual mobile home. Defendant has, nonetheless, effectively condemned the mobile homes by citing the owners with code violations. When the homeowners try to remediate the alleged violations, they are denied required building permits by Defendant or Defendant fails to provide necessary information, like the nature of the alleged violation. In some cases, inspections are inconsistent and the testimony of Village employees and contractors under oath contradicts Notices of Violation issued to the homeowners. A Village employee told one Homeowner he might as well prepare to move and has asked the rhetorical question, "How can those people raise kids back there?" Defendant's employees told a gathering of homeowners, shortly after the flood, that they would have to move and that building permits would not be approved.

**PARTIES, JURISDICTION AND VENUE**

3.      Defendant Village of Wheeling, Illinois is a municipal corporation located in Cook County, Illinois. The Village is governed by a Village President, Dean Argiris, who is white and a Village Board, of which each member is white. Authority for the daily operation of village government is delegated to Village Manager Jon A. Sfondilis, who is white. Defendant employs a Director of Community Development, Mark Janeck, who is white.

4.      At relevant times, Defendant perpetrated its conduct below individually and/or by and through its agents, over whom Defendant Village of Wheeling, Illinois exerted operational control concerning the facts at bar.

5.      All of the facts set forth in this Complaint took place in the County of Cook and State of Illinois.

6.      Homeowners all live in the County of Cook, State of Illinois.

7.      The subject property is located in the Village of Wheeling, County of Cook, State of Illinois.

8.      This matter involves a Federal statute, the Fair Housing Act This is an action for violation of 42 U.S.C. §3601 *et seq.* (Fair Housing Act). This Court has original jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal question).

9.      Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. §1391 because Defendant is a municipal corporation subject to personal jurisdiction this district.

**SUBSTANTIVE ALLEGATIONS**

10.      Defendant lists demographics of its population at 24.2 percent Hispanic and 56.7 percent White. Homeowners live in a community area and mobile home park recognized as Fox Point. All but five households, or about 88 percent, of Fox Point households include people of Hispanic                        national                        origin. http://www.wheeling.il.us/Business/PDF/ComprehensivePlan_2003.pdf, p. 35   (last   accessed 9/8/2013).

11.      Defendant maintains a "comprehensive plan." It states:    "Since   Wheeling   has relatively little single-family housing for upper income buyers, what land is available for new housing          should          be          reserved          for          this          market."

http://www.wheeling.il.us/Business/PDF/ComprehensivePlan_2003.pdf, p. 17 (last accessed 9/8/2013).

Since 2011, Village President Dean Argiris (then, Trustee Argiris) has contemplated removal of Fox Point. In a Village Workshop Meeting on May 9, 2011, Trustee Argiris suggested researching public housing options so these residents can be relocated to where it is safer and healthier for them. http://www.vi.wheeling.il.us/ReferenceDesk/AgendasMinutes/BoardOfTrustees/110509.pdf, p. 2 (last accessed 1/7/2014).

12. The Comprehensive Plan singles out the mobile home park as a problem area. A map shows the residential area including the predominantly-Hispanic mobile home park eliminated:

> "The portion of the Milwaukee Avenue corridor between Manchester Avenue and Palwaukee Municipal Airport at the south end of the Village is one of Wheeling's biggest challenges in terms of future land use. The current land use mix includes single-family houses, a mobile home park, old and new multi-family developments, and a variety of commercial, industrial and airport uses. The Village's corporate boundaries are irregular along this portion of the corridor, which limits Wheeling's ability to control the future development and ensure that the existing developments are properly maintained. The Future Land Use Plan calls for a more consistent land use pattern with commercial uses along the west side of Milwaukee Avenue, except for property along Industrial Drive, where industrial and airport-related uses are recommended." http://www.wheeling.il.us/Business/PDF/ComprehensivePlan_2003.pdf, pp. 42, 43 (last accessed 9/8/2013).

13. In 2012, the Village of Wheeling adopted a Building Code adding to Section 116 a provision that if a building is damaged to the point it cannot be repaired for less than 50 percent of its value, it can only be rebuilt or replaced for "conforming" uses. http://www.wheeling.il.us/ReferenceDesk/FormsAndPermits/ConstructionCodesAndLocalAmendments.pdf, pp. 17, 18 (last accessed 9/8/2013).

14. In April 2013, the Homeowners experienced flooding of their homes.

15.     Homeowners have tried to ascertain the extent of damage to their homes, find out the reason for code violations being issued against them so they could make repairs, and obtain building permits. At least three times, Homeowners have tried to communicate with the Village of Wheeling about needed repairs and building permits. The Village has refused to provide any materials in Spanish and has refused to provide clarification about the nature of the vague property violations mentioned in various Notices of Violation sent to the homeowners.

16.     Homeowners have been subject to constant harassment by Defendant's agents, including, but not limited to Mark Janeck. This includes, but is not limited to:

a.     Repeated property inspections.

b.     Inconsistent property inspections and inconsistent Notices of Violation.

c.     Citations for violations that are refuted by independent evidence. For example, Notices of Violation issued on May 15, 2013 make reference to flooding damage to "interior electrical outlet," "flooring," "subfloor," "floor covering" and other interior residential elements. During the administrative hearings following the notices, held October 2013 through April 2014, the Village's inspectors, including Mark Janeck and hired consultants, testified that they did not enter the units. The same notices referred to water standing in ductwork: "water visually observed standing in the ductwork." During the administrative hearings, Mr. Janeck and consultants testified that they could not clearly see the ductwork under the homes, that they did not inspect the inside of the ductwork, and that they did not touch it to see that it was wet. They did not see water standing inside.

d.     Denials of work permits and refusal to talk to homeowners about required repairs, in Spanish or otherwise. A volunteer architect was identified to decide what repairs could be done, but no homeowner representative, particularly Open Communities, an organization that

identified the architect, was allowed in the meeting with the Village, the architect, and the Village's legal counsel. The architect left the meeting refusing to have anything to do with the current Fair Housing Act litigation.

       e.     Comments to assembled homeowners, including, but not limited to, Sherry Lengieza, at the temporary flood shelter operated by the Village of Wheeling in April 2013 that homeowners should prepare to leave, that homeowners would be unable to get permits to repair the homes, that the homes were uninhabitable, and that homeowners would become ill if they lived in the homes for six months.

       f.     Repeated contentions that the homes are "sinking." On examination in the administrative hearings and in Federal court on a hearing on an injunction, Mark Janeck and consultants have admitted they have not measured the soil weight-bearing capacity with a pentrometer or torquemeter (recognized devices for determining weight-bearing capacity of soil) or even measured the height off the ground of the homes using a transit or even a yard stick. They admitted they do not know how much the homes weigh, what type of soil is at Fox Point, or what the underlayment of the soil at Fox Point is.

       g.     Comments by Mark Janeck and other officials employed by Defendant that Homeowners should prepare to leave or should sell Mark Janeck their property for $5,000.00—well under the market value.

       h.     Constant patrolling of Fox Point by Mark Janeck to harass residents. This includes, but is not limited to, an incident on or about May 28, 2014, when he forced residents to remove balloons from their property. The balloons were on display as part of a Quincinera (fifteenth birthday party) for a young woman who lives at Fox Point and whose parents are party to this Fair Housing Act lawsuit.

i.      Posting of signs declaring the homes "uninhabitable" after the filing of the Fair Housing Act complaint.

j.      Use of the administrative hearing process to harass and embarrass residents on account of limited English capacity and national origin. An example is the Village's counsel asking a Spanish-speaking homeowner why his eight-year-old daughter did not translate legal documents sent to the homeowner. Other Spanish-speaking homeowners with minor children were asked the same question, though none as extreme as implying an eight-year-old child could and should serve as her parents' interpreter and legal advisor.

k.      Use of the administrative hearing process to harass and embarrass residents on account of disability. In one incident, an elderly resident, Lynn Jones, stated Mark Janeck had been at Fox Point. The Village's Counsel asked her to identify Mr. Janeck. Ms. Jones pointed to Mr. Janeck, seated beside counsel at a table reserved for Village employees and counsel. She stated, "He is wearing a blue shirt." Defendant's counsel remarked triumphantly, "Let the record reflect Mr. Janeck is wearing a white shirt."

l.      Use of the administrative hearing process to harass and embarrass residents. Village of Wheeling Counsel, employees, and witnesses were provided a table. The identical table was marked "reserved" and was used by a Village employee operating visual equipment. The homeowners' attorney was forced to manage files consisting of three or four large rolling bags at a single chair. She had to use a hand-held microphone, interfering with her ability to read and take notes, and jump and run to the podium for any examination. She had to conduct examinations while standing, while the Village's attorney remained comfortably seated at the Village's table with space for microphones and paperwork. Sometimes, this meant counsel for

the homeowners shared a small physical standing space with one or two homeowners and a translator.

m.      Use of the administrative hearings process to harass residents, including holding hearings over Counsel's objection during the worst snowstorm of winter when police agencies had urged people not to travel on highways and some highways were closed. At least two times, hearings were held despite dangerous weather and travel conditions even through Defendant knew many of the homeowners were elderly and were people with disabilities. Many had known health conditions making it inadvisable to travel in the harsh weather.

n.      The Village has repeatedly used the homeowners' lack of English proficiency to create a disadvantage. In December, on the eve of a pleading deadline, the Village transmitted a purported 21-day safe harbor letter concerning threatened sanctions. The purported motion for sanctions consisted of nothing but threats and exaggerations based upon the limited English-speaking capacity of the homeowners that resulted in misunderstandings and translation errors in some testimony, all of which was immediately acknowledged when confronted. The purpose of serving the letter was to drive a wedge between the homeowners and their attorney, who had to notify them due to ethical rules. It was also designed to put the homeowners on notice that innocent translation errors would be used against them as a basis for sanctions and a source of embarrassment. It changed the relationship between the homeowners and their attorney by requiring more formalized use of translators instead of relying on free community resources. For example, the Illinois Department of Human Rights had to send an investigator and translator to Fox Point when the attorney explained that prior interpretation errors had been used in an intimidation attempt, making the attorney reluctant to translate Human Rights charge forms. In a similar attempt to exploit language differences, the Village tried to gain the dismissal of a

complaint for administrative review because the homeowner, representing himself and speaking and reading almost no English, failed to sign the initial complaint.

o.     On information and belief, the Village has pressured or encouraged the owner of Fox Point to sell the manufactured housing community pursuant to a buy-out program using Federal (Federal Emergency Management Agency) funds. Such a buy-out would result in closing Fox Point, and the residents of Fox Point would become homeless. The Village has unsuccessfully attempted to purchase Fox Point from Alpine Village Partners in the past.

p.     Mark Janeck stated to Terry Nelson, President of the Mobile Home Owners Association of Illinois (MOHAI), "How can those people raise a family in there?!" referring to Fox Point.

17.     The revised Property Maintenance Code unfairly targets Homeowners because the 50- percent damage limitation is more easily reached when assessing a mobile home that when assessing a single-family home. On information and belief, most owners and residents of manufactured homes in Wheeling are Hispanic.

18.     The revised Property Maintenance Code is selectively enforced against Homeowners. For example, on information and belief, a predominantly White community along the Des Plaines river was similarly flooded in April 2013. Defendant provided pumps and worked to mitigate the losses of the predominantly-White community and did not issue citations for building code violations or otherwise take action against the White residents whose homes were flooded and damaged in the same way as those belonging to Homeowners.

19.     The Property Maintenance Code is selectively enforced against Hispanic Homeowners to eliminate their manufactured home community, Fox Point.

9

20. The Comprehensive Plan calls for the elimination of the Hispanic Homeowners and their manufactured home community, Fox Point.

21. The Comprehensive Plan does not provide sufficient replacement housing within the redevelopment areas to allow displaced Hispanic residents to remain in the Village of Wheeling.

22. Enforcement of the Comprehensive Plan, Building Code, Property Maintenance Code, and other actions by Defendants against Homeowners will eliminate the Hispanic enclave represented by Homeowners and their mobile home community.

23. Since this lawsuit was filed, Plaintiffs have been subjected to repeated "inspections" by Defendants and many have had notices forbidding them from entering their homes posted on their homes without any due process. **Exhibit B**.

## I.   CAUSE OF ACTION:     VIOLATION OF THE FAIR HOUSING ACT BY DEFENDANT VILLAGE OF WHEELING

24. Defendant's enforcement of its Building Code as described above has made and will make housing unavailable because of national origin, race, or color and also constitutes discrimination in terms, conditions, or privileges of sale or rental of dwellings or in the provision of services because of national origin, race, or color in violation of Section 804(a) and Section 804(b) of the Fair Housing Act, 42 U.S.C. § 3604(a) and 42 U.S.C. § 3604(b).

25. Defendant's adoption and implementation of the Comprehensive Plan has made and will make housing unavailable because of national origin, race, or color in violation of Section 804(a) of the Fair Housing Act, 42 U.S.C. § 3604(a).

26. As set forth above, since the time when this suit was filed, the Village has continued to post notices on the homes stating they are uninhabitable (**Exhibit B**) and some residents have left in response to this pressure. At least some notices were posted on homes of

people who are Plaintiffs in this Fair Housing Act lawsuit or who have otherwise exercised their fair housing rights.

27.     The instant fair housing case was filed in September 2013 and the Village placed the stickers on homes on or about October 16, 2013 while both the fair housing case and contested administrative hearings were pending.

28.     In addition to the damage listed above, the actions of Defendant Village taken after the filing of the instant action constitute coercing, intimidating, threatening or interfering with any person's exercise of his or her rights protected under 42 U.S.C. § 3604, in violation of 42 U.S.C. § 3617

29.     The conduct of Defendant, through its officials, described above, constitutes a violation of the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.*

30.     There are persons who have been injured by defendant's discriminatory actions as described above and are aggrieved persons as defined in 42 U.S.C. § 3602(i). These persons have suffered, or may have suffered, damages as a result of Defendant's discriminatory conduct.

31.     Defendant's conduct has been intentional, willful, and taken in disregard of the rights of Hispanic residents of the Village of Wheeling, particularly Homeowners and their manufactured home community, Fox Point.

## II.    CAUSE OF ACTION:        VIOLATION OF THE FAIR HOUSING ACT

32.     As set forth above, Defendant Mark Janeck stated, "How can those people raise a family in there," referring to Fox Point.

33.     "Those people," as used by Defendant Mark Janeck, was understood to mean the predominantly-Hispanic residents of Fox Point.

34.     ". . . raise a family," as used by Defendant Mark Janeck, referred to the familial status of many families in Fox Point, many of them including minor children.

35.     As set forth above, separate and apart from the administrative code enforcement actions complained of when the instant action was originally filed, Defendant Village of Wheeling has visited Fox Point and posted notices on the homes stating they are uninhabitable, forbidding residents to enter their homes, and doing all of this without any hearing or due process of any kind. An exemplar notice is attached as **Exhibit B**.

36.     As a result of the above actions, some residents have left their homes.

37.     The conduct of Defendant, through its officials, described above, constitutes a violation of the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq*.

38.     There are persons who have been injured by defendant's discriminatory actions as described above and are aggrieved persons as defined in 42 U.S.C. § 3602(i). These persons have suffered, or may have suffered, damages as a result of Defendant's discriminatory conduct.

39.     Defendant's conduct has been intentional, willful, and taken in disregard of the rights of Hispanic residents of the Village of Wheeling, particularly Homeowners and their manufactured home community, Fox Point.

## III.    CAUSE OF ACTION:    VIOLATION OF THE FAIR HOUSING ACT BASED ON DISPARATE IMPACT

40.     The Village's actions, practices and policies, as described above in the Complaint, have had and continue to have a substantial adverse, disparate impact on Hispanic households in violation of the Fair Housing Act, 42 U.S.C. § 3604 (a) and (b). Further, the Village's actions violate HUD's prohibition, effective March 18, 2013, on disparate impact, 24 CFR § 100.70(d)(5), on: enacting or implementing land-use rules, ordinances, policies, or procedures

that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings to persons because of race, color, religion, sex, handicap, familial status, or national origin.

IV.   **CAUSE OF ACTION: VIOLATION OF THE RIGHT TO DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION ACTIONABLE PURSUANT TO 42 U.S.C. § 1983**

41.   As set forth above, Defendant Village has posted notices forbidding them to enter their homes without affording any due process whatsoever. **Exhibit B**. This was done outside the administrative hearings process then pending in the Village of Wheeling.

42.   As set forth above, the Village of Wheeling has taken actions that infringe upon and deprive the homeowners of their property rights without meaningful and adequate notice and opportunity to be heard.

43.   The Village of Wheeling, acting under color of state law and local ordinance, has deprived Homeowners of their rights secured by the Due Process Clause of the Fourteenth Amendment, actionable under 42 U.S.C. § 1983.

V.   **CAUSE OF ACTION:       VIOLATION OF CIVIL RIGHTS ACT OF 1866, 42 U.S.C. §1982**

44.   The Homeowners reallege and incorporate by reference the allegations in all previous Paragraphs of this Complaint as if fully pleaded herein.

45.   The Civil Rights Act of 1866, as amended, 42 U.S.C. § 1982, guarantees that ". . . [a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property"

46.   By seeking to declare uninhabitable or demolish all the homes within Fox Point and maintaining and implementing a comprehensive plan that shows the elimination of Fox

13

Point, the Village is intentionally seeking to deprive the plaintiffs and other Hispanic residents **of**

right to inherit, purchase, lease, sell, hold, and convey real and personal property as is enjoyed by

white citizens, in violation of to 42 U.S.C. § 1982.

47.    The Village has otherwise intentionally discriminated against the Plaintiff

Homeowners  and other Hispanic residents of Fox Point as described above.

48.    The Village has thus violated Plaintiffs' rights guaranteed under 42 U.S.C. §1982.

## VI.    CAUSE OF ACTION:      VIOLATION OF EQUAL PROTECTION CLAUSE OF FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION ACTIONABLE PURSUANT TO 42 U.S.C. § 1983

49.    The Homeowners reallege and incorporate by reference the allegations in all

previous Paragraphs of this Complaint as if fully pleaded herein.

50.    The Village has intentionally discriminated against plaintiff Homeowners and

other Hispanic residents of Fox Point as set forth more fully above.

51.    The Village has, under color of state law and local ordinance, intentionally

deprived the Homeowners of their rights to equal protection under the law as guaranteed to them

by the Fourteenth Amendment of the United States Constitution because of their race, ethnicity

and/or national origin, actionable pursuant to 42 U.S.C. § 1983.

## VII.    CAUSE OF ACTION:       VIOLATION      OF      LIMITED      ENGLISH PROFICIENCY RULES

52.    The Village of Wheeling is a recipient of Federal funds. In particular, the

Community Development Department benefits from the National Flood Insurance Program. On

information and belief, it has applied for assistance or received assistance from FEMA.

53.    As set forth above, none of the documents in the administrative actions, activities

related to code enforcement, or procedures for prospective building permits, all conducted by the

Community Development Department, have been provided in Spanish.

54.     The administrative law process was only subject to Spanish interpretation as a result of an agreement from the instant lawsuit.

55.     Title VI of the Civil Rights Act requires recipients of Federal funds to provide interpreters and translated documents to people with limited English proficiency.

56.     Most of the Plaintiffs and most of the residents of Fox Point have limited English proficiency.

57.     On information and belief, the Village of Wheeling lacks any plan for providing limited English proficiency services.

58.     The Village of Wheeling's failure to provide limited English proficiency service is a violation of Plaintiffs' civil rights under Title VI.

### REQUEST FOR DECLARATORY RELIEF

59.     Homeowners, on the one hand, and Defendant, on the other hand, have adverse legal interests, and there is a substantial controversy between the parties that the Court can resolve by declaring the parties' respective rights.

60.     Homeowners have an interest in and a right to remain an owner of their homes, including the right to afforded a fair opportunity to bring their homes into compliance and the right to limited English proficiency services.

61.     Homeowners are to a declaration, *inter alia,* that that Defendant Village cannot apply discriminatory criteria and selectively enforce sections of the Property Maintenance Code or other Village ordinances to deprive them of their homes; that Defendant cannot implement the Comprehensive Plan designed to deprive them of their homes; that Defendant must provide documents in Spanish and provide Spanish-language interpreters where needed; and that

Defendant cannot continue prosecuting them for code violations without giving them building permits and time to make needed repairs.

62.     Inasmuch as fees for wrongfully-denied building permits and fines have been charged against Homeowners due to the wrongful and discriminatory conduct of Defendant, Homeowners seek a declaration that such charges are unlawful and an order providing for a refund or credit of such charges, including associated interest, financial charges and damages, court costs and attorney fees, and an appropriate accounting thereof.

63.     Homeowners seek corresponding injunctive relief, including a Court order that Defendant is restrained from bringing any administrative or other action to dispossess them of their homes.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all claims and issues which have a right for a jury to render judgment.

WHEREFORE, the Homeowners, listed on Exhibit A, pray that the Court enter an ORDER that:

1. Declares that the actions of the Defendant described herein constitute violations of the Fair Housing Act;

2. Enjoins the defendant, its officials, agents, and employees, and all other persons in active concert or participation with it, from continuing to discriminate on the basis of national origin, race, or color in violation of 42 U.S.C. §§ 3601 et seq.;

3. Requires such actions by the Defendant as may be necessary to restore all persons aggrieved by Defendant's discriminatory housing practices to the position they would have occupied but for the Defendant's discriminatory conduct;

4. Requires provision of Spanish-language documents and translators in all Community Development activies;

5. Awards monetary damages to each person aggrieved by Defendant's discriminatory housing practices pursuant for actual, compensatory, pain and suffering, and attorney's fees and costs of bringing this action.

6.     For such other relief as justice may require.

Respectfully submitted,

HOMEOWNERS


/s/Kelli Dudley
By: _____
Kelli Dudley, Attorney for Plaintiff Homeowners

Kelli Dudley, The Law Office of Kelli Dudley
9130 S. Houston Ave., 1st Floor
Chicago, IL 60617-4319
Ph: 312-771-9770 Email: attorneykelli@sbcglobal.net
ID #6279068


**CERTICATION**

Kelli Dudley, an attorney, certifies that she served a copy of this pleading upon all parties and counsel of record in this case by filing it through the on-line filing system, which provides copies and electronic notice to all counsel of record, on July 21, 2014.

/s/Kelli Dudley

Kelli Dudley

**EXHIBIT A**
**PAGE 1 OF 2**

## HOMEOWNERS OWNING UNITS AT THE COMMON ADDRESS 573 MILWAUKEE AVENUE, WHEELING, ILLINOIS  60090-5066

| NAME | UNIT NUMBER | MINOR CHILDREN IN UNIT |
|---|---|---|
| Ranulto Teran | 1 | 3 |
| Elena Corona | 1 | |
| | | |
| Juan G. Lara | 2 | |
| Maria I. Lara | 2 | |
| Arturo Lara | 2 | |
| | | |
| Crystal Antunez | 5 | Pregnant when left unit |
| | | |
| Saul Cruz | 6 | 3 |
| Emma Cisneros | 6 | |
| | | |
| Cesar Herrera | 7 | 1 |
| Daisi Cisneros | 7 | |
| Angel Herrera | 7 | |
| | | |
| Aned Hernandez | 8 | 1 |
| | | |
| Ken Nash | 9 | |
| Linda Abrahamson | 9 | |
| | | |
| Lynn Jones | 11 | |
| | | |
| Herbert Wolff | 12 | |
| | | |
| Esteban Barrera, Jr. | 13 | 2 |
| Reyna Velazquez | 13 | |
| | | |
| Nahucelio Guadalupe | 14 | 3 |
| Inocencia Guadalupe | 14 | |
| | | |
| Jean Piatrowski | 16 | |
| Sherrry Lengieza | 18 | |
| Roberto Flores | 20 | 2 |
| Sylvia Bahena Navarro | 20 | |
| | | |
| Wendy Lara | 25 | |

| | | |
|---|---|---|
| Denise Lara | 25 | |
| | | |
| Javier Sanchez | 26 | |
| | | |
| Juan Carlos Rodriguez | 27 | |
| Lucy Bravo | 27 | |
| Leonardo Bravo | 27 | |
| | | |
| Elias Carreno | 30 | 2 |
| Maria Carreno | 30 | |
| | | |
| Esteban Barrera, Sr. | 32 | 2 |
| Mercedes Barrera | | |
| Jose A. Guillen | | |
| | | |
| Ernesto Garcia | 33 | 3 |
| Leonardo Chan | 34 | 5 |
| Claudia Chan | 34 | |
| | | |
| Osvaldo Chavez | 35 | |
| | | |
| Evangelina Ortiz | 37 | 2 |
| Felipe Ortiz | 37 | |
| | | |
| Pablo Moncada | 38 | 1 |
| Felipe L. Moncada | 38 | |
| Elina Martinez | 38 | |
| | | |
| Fernando J. Manrique | 39 | 2 |
| Linda Lara | 39 | |
| | | |
| Eloy Hernandez | 43 | 3 |
| Marciela Hernandez | 43 | |
| | | |
| Javier Barrera | 43-A | 2 |
| Mai Delores Barrera | 43-A | |
| Alejandra Barrera | 43-A | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |